Pleases the court, Judge Yelrod, Judge Clement, Judge Southwick, My name is Knox Nunley and I represent the appellant Anthony Shore. An old proverb states that for one of a nail a shoe was lost, for one of the shoe the horse was lost, for one of the horse the messenger was lost, for one of the messenger the battle was lost. I argue today that this proverb is a direct metaphor of the reason why my client, Anthony Shore, seeks this briefing today and ask for your relief. Received from Mr. Shore, the battle that he has lost is the death sentence and the execution by lethal injection. The nail, the nail I would argue is the fact that he had a traumatic brain injury. Organic brain injury is what they used to call it, but now in the common parlance of our society, thanks to the wars in Iraq and Afghanistan, we're familiar with the term TBI, traumatic brain injury. What evidence is there in the record of that? Your Honor, on the record you can find in our briefing an excerpt report submitted by Dr. Keel and Dr. Orbison in which they have, through an MRI scan done on behest of a federal habeas council, found that there is evidence of a traumatic brain injury in Anthony Shore. And what do they relate that to? Your Honor, during the investigation initially by trial counsel, it was determined that Mr. Shore and his report to her had sustained a serious car accident in 1981. Now, that was further developed by federal habeas council and our investigator. We found out that he also sustained another injury when he was a young man on a bicycle. In both those injuries, Mr. Shore sustained unconsciousness. It was the day of the bicycle accident. We do not know that date accurately, Your Honor, but it was around the ages of 10 to 12. And there's no medical records reflecting that? No, there are not, Your Honor. And no medical records reflecting the 1981 injury? Not on the record, Your Honor. All right. Mr. Shore's application for certificate of appealability is based on three claims. Those three claims, Your Honor, are first, ineffective assistance to counsel done by the trial counsel by not doing a proper investigation of mitigation circumstances. Also, by trial counsel, this is part, again, of the first claim, of not properly submitting evidence of traumatic brain injury to the trial court during punishment phase for mitigation. And third, again, this is part of the first claim, ineffective assistance to counsel of challenging witnesses and rebutting evidence presented. The second claim is denial of constitutional rights. How is it a failure where counsel's expressed wishes are being followed? So, Your Honor— I mean, the client's expressed wishes are being followed by counsel. So, Your Honor, we believe that ignorance is not a strategy. And Mr. Shore's decision, this goes back for one of a nail, was based off an inaccurate understanding of what evidence and defense he could raise. Any guidance he gave to counsel, and there's very little of that on the record, Your Honor, any guidance he gave to counsel was based off a misunderstanding that he did not have anything to explain. Well, we—doesn't that put us in a—we can't—we can't assume that, can we, that he had a misunderstanding or didn't know? Because the Texas Court of Criminal Appeals said, viewing the record as a whole, the trial court implicitly and correctly ascertained that appellant made a competent, knowing, intelligent, and voluntary waiver of his right to present mitigation evidence. So, you can't argue now before us that he didn't understand when the state court has made a factual determination to the contrary. Can you, under the deferential EDFA standards that we must follow, isn't that a significant hurdle for you, counsel? Your Honor, it is, and I would like to point out two things on that subject. First of all, the waiver. If a waiver is found, we do not believe it can be found because the records do not show that, and I would say that for two reasons. The first off, during punishment, there was an opening argument, the state presented their case, and then it became the opportunity for Mr. Shor's counsel to present his case. At that point, Mr. Shor's counsel and trial counsel began to discuss whether or not he waived his defense. What was not discussed, what was not done in any manner or form, either out of the presence of the jury or in front of the jury in the record, was any waiver colloquy before opening arguments of counsel. The reason why that's important, Your Honors, is because it's in that opening argument, the opening argument his counsel made to the jury in punishment that they first said that they believed that Mr. Shor deserved to die, that he wanted to die, that Mr. Shor knew he had none, no available defense to explain his actions, and that none could be presented. This was all done before the judge or his counsel put anything in the record about whether or not there was a waiver. And again, our argument would fall back to, Your Honor, is when the waiver was actually brought up, it was very simply the judge asking Mr. Shor if he agreed with what his counsel had said, and Mr. Shor saying four words, and that was, that is very accurate. We do not believe that that was a valid waiver, and we would disagree with the Criminal Court of Appeals and with the District Court's interpretation in the record. Right, but can you just disagree, can we just disagree? We can't just disagree, can we? We have to defer, don't we? Your Honor, we do not believe that we should defer, because we believe— Is there any legal authority, I understand you think it would be a bad thing to do for your client, and I understand the seriousness of the situation, but what legal authority tells us we can disregard the factual finding of the state court? Well, Your Honor, we would argue that the ability of us to raise this claim, even though it is exhausted, would be permitted under the exception of Martinez and Trevino. And it all comes back to whether or not counsel, both at the state habeas level and the trial counsel level, should have or could have been effective counsel. We believe that because it was not offered at the state habeas level, that Mr. Shor's claim on the waiver is invalid, because how can he make a knowing decision of waiver if he does not know the facts that he is actually waiving? Did he have the same counsel at trial as he did on direct appeal? He did not, Your Honor. All right, well, on direct appeal, did Mr. Shor admit in his brief that he desired to waive mitigation and accept a sentence of death? He most certainly did, Your Honor. All right, so how can we ignore that? How can you ignore that? Judge, we do not ignore it. In fact, we believe that both on his direct appeal and similar statements were made under state habeas appeal were ineffective census of counsel actions. We do not agree with them. We do not support them. Mr. Shor's counsel did not investigate, even though both direct appeal and habeas counsel were aware of the possibility of a brain injury, traumatic head injury, did not investigate or carry out any type of investigation or testing. None of that happened until federal counsel. The other two claims, Your Honor, and I would say that our primary argument before you today, and I will spend the majority of my time, is on the ineffective census of counsel argument. And I understand the interest in the waiver argument. The third argument we were making, which I will not answer, I will answer any questions you have, I'm not going to spend very much time on, is the Eighth Amendment argument. We believe that Mr. Shor, suffering from a traumatic brain injury under the same rulings that have been made in Atkinson for mental retardation and in Roper for whether or not a minor of 18 years old or younger may be executed, should apply to Mr. Shor. And that's simply based upon the rulings that were made in those cases, we believe were made for the exact same reasons that we would argue Mr. Shor or traumatic brain injury appellant should have the same protections. Are you just raising this for preservation of error at this point? No, Your Honor. Because don't we have binding precedent in the Fifth Circuit that forecloses that argument and we are a rule of orderliness court and therefore we can't do anything different even if you, even if we agreed with you? Your Honor, we believe that is true, but we also believe that it is required of us to make the arguments which we believe apply to our client. We strongly believe this argument. Right, but what I'm saying is you're making it for preservation points so that you can argue it later, not that you actually think we could grant you relief here today on it. Because we have to follow the rule of orderliness, don't we? Your Honor, that is true. Okay. And it's not just the rule of orderliness, it's the fact that it's procedurally barred by T because it doesn't rely on clearly established Federal law either. So it's three, I mean, those are . . . That's correct, Your Honor. There are three hurdles in the rule of orderliness being the first one. That is correct, Your Honor. Okay. One of the major questions revolving State's response to our briefing and also regarding the opinion given by our Federal District Court deals with whether or not we can procedurally bring some of these claims and present new evidence. And I would like to address that very briefly before going into our claims. I've already mentioned Martinez-Trevino. That is the exception we believe applies to our ability to argue non-exhaustive claims. Simply that Mr. Shor's ineffective counsel at the State habeas level, the first opportunity he had to bring ineffective sentences to counsel was prevented by his counsel's failure to present these claims and that now we're able to present it for the first time at the Federal habeas level because it's the same thing as whether he had no counsel or actually, as we argue, ineffective counsel. How would the counsel have been able to present the argument? With the client saying you're forbidden to present it, how would the counsel have presented the argument? Your Honor, our interpretation would be that, first of all, we were not aware of any guidance to State habeas counsel telling him not to present it and we also would argue that our client had no idea such a defense existed. He simply, as a normal procedure in his pretrial questioning by the mitigation expert, gave his life story and said, yeah, I was in a car accident, a car accident in which I was unconscious and went to the hospital and had some surgery and dental work done on my face. We were saying that Mr. Shor's State counsel, habeas counsel, had equal access to the records from the jury trial and from his investigator and should have seen that and should have fleshed that out. And the fact that it was not fleshed out by that counsel has made it our requirement and our duty as Federal habeas counsel to make that argument for him. We believe it's an important argument. The second burden we have to cross dealing with whether or not these procedurally changed to such a significant extent the original claims and fleshes them out to more heavier claims, the ability to admit new evidence for this Court to approve those claims. What new evidence was found?   Your Honor, the new evidence that was found by Federal habeas counsel was twofold. The most important, obviously, being that through an investigation by our expert, who actually went and interviewed Mr. Shor, two instances of possible head trauma. Now, based upon understanding that there were two possible issues of head trauma, we conducted it, we requested, we were given authorization by the courts to conduct an MRI. That MRI and the expert opinion based upon the results of that MRI is the new evidence we hang our hat on on arguing this traumatic brain injury effect, which I will say very clearly to this Court, we believe would affect the moral culpability of Mr. Shor. This would go into the second special issue in any jury instruction in Texas on the death question. The second procedural area, which was the exhaustive claims, we believe is covered by Brown v. Estelle. The third, and again, this goes towards the Eighth Amendment, we believe that we are allowed to bring this claim through the miscarriage of justice exception. We understand that to bring this exception, we must show that our client was factually innocent, either by guilt or on punishment. We are not here sitting before this Court ordering any factual innocence of guilt. We are simply arguing that if you are to take the impression that Mr. Shor, TBI, is equivalent to, say, Atkins or Roper with mental retardation or an 18-year-old or younger, that it could apply. Before going any further, I think it's probably helpful to briefly review the facts that have necessitated Mr. Shor making this defense, and I'll be very brief on this. It's really three acts. The first act is prior to trial. As I already stated, we believe that Mr. Shor suffered at least two possible brain injuries, once as a young man, a second as a 1981, which I would point out is before any of the sexual assaults or murders that were later proven up or argued during punishment. Also, according to prior trial, was the investigation by Gina Vitale, where it was put into the notes, and it was noticed by trial counsel that he suffered a head injury. The second act of the trial itself, and here, again, I want to go over exactly what happened with Mr. Shor and punishment. The jury returned a guilty verdict. Following the guilty verdict, without any waiver, any discussion, out of the presence of the jury or in front of the presence of the jury, Mr. Shor's counsel became a third prosecutor in the courtroom, and through their opening argument, basically absolved the jury of any moral question or right in making a determination of death or life. And, Your Honor, I would refer you to pages 10 through 12 of the state's opposition. That full argument is listed there for your review. Also, following the state's case, at this point, trial counsel and the court finally decided to put something on the record. And that's when, in a very brief, very brief discussion outside the presence of the jury, the judge asked counsel to explain why he would not be presenting an argument. He simply said, and I am paraphrasing here, that we are going to waive arguments in this case completely based upon consulting with my client, Anthony Shor. The judge simply said, Mr. Shor, is this accurate? Mr. Shor said, yes, or actually just said, that is very accurate. Following that, his counsel did not present any argument and was silent for the rest of the trial. Finally, the third act, and that is what occurred after trial, and this is what is important. After trial, federal habeas counsel discovered that Mr. Shor had an actionable real defense. Unlike what his lawyer told the jury, prior to any waiver discussion with the judge, I again remind the court, and I will say again what his lawyer told the jury, because I think this is important. The evidence is going to show he has no explanation for why he is the way he is. He has no explanation for what he has done. What we are saying is, had he known about this traumatic brain injury, Mr. Shor would have had that explanation. What did he have? Because I don't think the experts establish a causal link between, even the new experts do not establish a causal link, do they? Your Honor, what our experts do say, and as for a causal link, I think it is a matter of interpretation. The way they review the MRI results is very simply that a traumatic brain injury occurred or, and the alternative, fetal alcohol syndrome, the mother drinking too much while the baby was in the womb, and that either one of these effects could have an effect causing behavior abnormalities in anyone suffering from them. But it could be any kind of behavior. It could be emotional outbursts. I thought it was a very broad range of behavioral abnormalities. It wasn't, would lead to violent, destructive tendencies. Am I wrong on that? Judge, you're true, but it could. And what we are saying is, in a situation in which it takes one juror, one single juror, and again, I would remind the Court that organic brain injury, or TBI as we know it today, is a much more well-known and discussed issue amongst our population. Again, this is brought about by reports in the media, in movies, in modern TV, dealing with veterans returning with effects that change the way they behave. We believe that one juror, upon hearing this type of testimony, could, on the second special issue, have found, and we are not saying that this is exactly why Anthony Schor did the things that he did. We are saying it could be a factor why he did the things he did, and that a juror believing that could reasonably come back with the verdict of, he deserves life and not death because of a lack of moral culpability. Are these claims properly before us, that the pinholster doesn't borrow the consideration of the new evidence in connection with the unexhausted Strickland claims pursuant to Trevino and Martinez? Because they're not raised in the initial brief, and the reply brief doesn't say why death's excused or anything. So are we even allowed to consider this argument? Your Honor, yes. We believe you are allowed to consider this argument. Again, for the unexhausted claims, we believe Martinez-Trevino gives us the right to bring these. There's a two-prong effect for Martinez-Trevino. First prong being we must show that there was a substantial claim that could have been brought. Second, we must show that ineffective assistance to counsel or no counsel was a reason why it was not brought at the first level it could have been brought, which is the state habeas level. But I'm talking about a waiver problem with the briefing in this case, not by prior counsel who may or may not have been effective based on your arguments. I'm asking, do we have, can we consider this argument since it's in the reply brief? Your Honor, during our initial briefing, both to trial counsel and, let me refresh, Your Honor. In our initial briefing to the district court, in our initial certificate of appealability, we argued that Martinez-Trevino does apply to these claims and gives us a right to pursue them in front of this body. Am I incorrect? Did you argue it in your initial brief to us as well? Yes, Your Honor. You did? We did argue that in our initial briefing, Your Honor. Okay. Thank you. I want to speak very briefly on the second claim we have brought dealing with the issue of a waiver. And I just want to review our arguments with you very briefly. We believe that there is no record of a waiver. We believe that a record of a waiver could have been made by trial counsel and could have been made by the trial court, but it was not made. And if you look at what was said, it is difficult to find anything there. Because that waiver was not made properly, we believe it is unreliable. And the reason why it's unreliable is how can one make a waiver, even if a waiver is made, if he fully does not know what he is waiving? Finally, one of the cases mentioned by the State and both by the district court in their opinion is a case called Landrigan. And Landrigan is a case which speaks to one of the issues you brought up earlier, Judge Elrod, in which you stated if a petitioner has waived at trial level, how can we now allow his argument? There is a factual difference between Landrigan and Arcaz. In Landrigan, the extra evidence that Mr. Landrigan wanted to offer to the federal habeas court was an extra affidavit from his father. So during trial, Mr. Landrigan had the opportunity to present evidence, an affidavit from his mother saying that she had drank a lot and did drugs when he was a small child and pregnant with him. The only piece of evidence he wanted to offer a federal habeas that brought this claim up was an affidavit from his father saying the same thing. This was not new evidence. This was not something that Mr. Landrigan did not know at the time he made his initial waiver. Mr. Schor's case is different because Mr. Schor, at the time he made a waiver, if you find that a waiver was made, was not made with knowing the later evidence he would put before the court, namely that he had a traumatic brain injury. But is there any evidence other than the MRI that he actually was below average intelligence? I mean, there's a lot of supposition, but is there any evidence that he actually suffered from not knowing right from wrong? Judge, the only evidence that we could possibly offer would be other evidence presented during the case in chief of Mr. Schor's abnormal activities for someone of his age in the community. How old was he when he killed the kitten? Your Honor, this is an important question, and I want to address this directly. The only evidence of that came from Regina Schor, Anthony Schor's sister. The age she claims she was when this occurred was 1 or 2 years old. She claims that Anthony Schor did this when he was between the ages of, I'll say, 3 and 5, and she's only 2 or 3 years younger. This is one of the things that we believe counsel was ineffective in addressing during trial. We believe they should have, on cross, said, number one, you were 2 years old or 1 year old. How do you remember this? And second, we provide an affidavit of this with our initial briefing to the federal district court. We have an affidavit from Anthony Schor's father, who lives in Houston. Trial counsel, mitigation expert, never interviewed him. When we interviewed him, which was not hard, we found him very easily and quickly, he said, I certainly would know two things. One, if my 3 or 4-year-old son killed a kitten, and two, if my 3 or 4-year-old son stabbed a screwdriver into my baby daughter's head. I don't have any recollection of that occurring. And we believe that his testimony could have rebutted and challenged that testimony. Okay. Thank you. Saves some rebuttal time. On rebuttal, can you please tell us where in the brief Martinez and Trevino were mentioned? Because I've gone through your table of contents again and the brief again, and I don't see those mentioned in your initial brief. Yes, Your Honor. Thank you. All right. Ms. Miranda, is that your real name? Yes. And I'm actually married to a law enforcement officer, so it gets better. May it please the Court. There are three indisputable points in this case that preclude the petitioner from obtaining a COA. First, it was the petitioner and not trial counsel that is responsible for the absence of mitigating evidence at trial. Second, and more importantly, even if he could somehow blame his attorneys for this, there's absolutely no way on this record that he can prove prejudice. The State's case against him was virtually insurmountable. The State presented overwhelming and compelling evidence that Anthony Schor was a serial rapist and a serial murderer of young women and young girls. It is difficult to imagine what, if any, mitigating evidence was going to convince the jury in this case that a life sentence was appropriate rather than a death sentence. And then finally, the only way for him to get around these first two points is to argue for the creation of new constitutional law, which this Court and the Supreme Court has already acknowledged is Teague Bard and otherwise Bard. At the heart of this case, obviously, is the directive that he gave to counsel not to forego – let me back up – the directive to forego a punishment case, and that's exactly what it was. It was specifically – he told his attorneys, and we can see this from the record, that he did not want him to present a punishment case. He wanted him to instruct the jury that – to answer the special issues in a way that the death penalty resulted. Now, in his brief, there are a lot of issues that arise out of this. However, the only question before this Court is whether reasonable jurors would disagree that he has overcome the presumption of correctness that attaches to the State court's finding that he did, in fact, direct his counsel to waive both evidence and argument. And if he cannot overcome this presumption, which we would argue he cannot, then that forecloses his ineffective assistance of counsel claim, irrespective of – What do we do with Zerbst, which seems to say that it must be on the record, that even though there's a record finding that we talked about earlier and you've mentioned – Well, I think Zerbst says that – I believe that Zerbst says the presumption, obviously, is that it's on the record. But I don't think there's any precedent from the Supreme Court or from this Court that would say that when it comes to matters of trial strategy, which this is, and the CCA, the Court of Criminal Appeals, said this was. And I think even in Landrigan, the Supreme Court acknowledged that this is about the presentation of evidence or the decision not to, so it's a matter of trial strategy, that there has to be, one, any kind of knowing or voluntary waiver, or even – In fact, there are instances when a petitioner may waive guilt innocence or evidence in a trial case, in a capital case, and decide to go for punishment. And there's never been any kind of requirement that that has to be on the record. And so in this case, there is no firmly established law to that respect. And because we are in federal habeas, the only question is whether he's overcome the deference that is afforded to the State court, and he can't. And if I can go back to the argument about the existence of the directive, because that's what it was, his instruction to counsel, and the only thing that he has to rebut the presumption of correctness that applies to this, he doesn't have any evidence. He has no new evidence. And as the district court correctly pointed out, there's no affidavits from trial counsel. There's nothing. All he has is an alternative interpretation of the record. And reasonable jurists are not going to find it debatable in that respect. Not only is it an alternative interpretation of the record, it's one where he isolates a single sentence and he pulls it out of context. He gives it an extremely narrow reading and says the only thing that his counsel or that his client really wanted was for his attorneys not to argue. And that's not the case. You have to look at the record as a whole. And if you look at the whole record, you will see that at the beginning of the punishment phase, counsel stood up during opening arguments and told the jury, this is not what I would do. I don't think this is a good idea. This is against my experience and my advice. But my client wants me to tell you to answer the special issues in a way that the death penalty will result. And he didn't just want to be silent. He wanted to get the death penalty. Absolutely. And that's what counsel indicated in the record was that he wanted the death penalty. And he told the jury that he was going to sit silent with the exception of possibly some legal things he might say. And he proceeded to sit silent through 35 punishment witnesses, making only certain a few objections. And then when it came time for closing arguments, counsel got back on the record and said you will remember, Your Honor, that this is what we did in the opening statements. And then he again said, Hey, I even went back this morning to make sure that this is what he wanted me to do. And he informed me most insistently that this is what he wanted. And then when the trial judge asked Mr. Schor if that was an accurate reading or an accurate, what counsel said was accurate, he said that's absolutely or that's very accurate. So I don't think there's any question in this case that he was asking his attorney to get him the death penalty. So even if we could go behind the state court ruling in this regard, which I know you urge we should not, is there anything in the record that shows that he didn't understand that, you know, like in an Adkins case or something where he's not cognizant enough to know this, that he's going to make it so that he's going to get the death penalty? No, Your Honor. In fact, I would say the very opposite is true. There is a lot of evidence throughout the punishment phase from various witnesses, and then it's argued even during closing arguments by the prosecutor about how smart and intelligent he is. And so there's really no question about his competence, his understanding. I think that, again, I don't think we can go beyond, but if we are going to go beyond, if you want to read into counsel's statements when he says, when he tells the jury that this is against my advice, I think we can read from that that he's telling his client, I don't think this is a good idea. In fact, we know because he went back and asked him again, are you sure this is what you want to do? So there's really no question that he understood that the result of his actions was going to be the death penalty, and that by foregoing a punishment defense, that's precisely what would happen. And not only did he understand that, but counsel informed the jury that he wanted the jury to know that he thought he deserved that. And if they thought that that's what he was deserved, then he was fine with it. So even if there were, which there isn't, any sort of knowing and waiver requirement, there it is right there. So it's not one of those cases that we sometimes see where the person is despondent and suicidal or something, and so they're not mentally capable. He says, I deserve to be punished and wants to die. There is no issues at all with respect to his competence. In fact, I think the district court points out with respect to competence that the trial judge had just prior to punishment taken the true pleas with respect to the two indecencies on the revocation on the indecency. So he was the judge had assured himself in that respect of his competence. So I don't think there's ever been any argument from the Petitioner with respect to competence either. Irrespective, and I don't want to take a lot of time from the Court because we believe that there simply is no way for him to overcome. Well, he just hasn't overcome that presumption. But regardless, even if he could, like I said in my second point, even if he were somehow able to blame his attorneys, there's absolutely no way on this record for him to prove prejudice. First of all, his brain scan evidence and the other evidence of the affidavit from Mr. Schor's father is foreclosed in this proceeding. A pinholster very clearly addresses that. There's no issue about that. And even if there were an issue about it, it would render his claim unexhausted, and he absolutely cannot avail himself of Martinez or Trevino because to do that, he would have to show a substantive underlying claim, and he simply cannot. I believe, and the State firmly believes, that he could have omitted this ineffective assistance of counsel claim altogether from his State habeas petition and not been deficient because of his client's directive at trial. So there's no way for him to get past the procedural bar. But regardless, pinholster applies. I think that the cases that we cited in our brief with respect to that, and I believe it was Lewis and Trotty, make that very clear that when you confront a situation like this, it's pinholster that controls. But again, the district court, I think, went in the alternative and the alternative and the alternative in a lot of instances. And so let's say somehow this court could consider the brain damage evidence. He still cannot prove prejudice. On one hand, we have to remember that it's not a little mountain he's climbing. It's a huge mountain of aggravating and damaging evidence on punishment. Even aside from the three extraneous rapes and murders, you have another extraneous rape. You have several girlfriends and his wife and his daughters talking about sexual assault. So you're talking about a huge mountain that he has to come. And the mitigating evidence that he's presented in this case is in no way compelling. The first part about his dad, the district court clearly and correctly held that that's attacking a very tiny part of the evidence in this trial, which was his sister's testimony about the kitten and about what he used to do when he was a young child. Obviously, that's a part of it, but it's a small part of it. It wasn't even really touched that much in the State's closing argument. Even beyond that, and I think more importantly with respect to the brain damage evidence, there is the district court called it, I believe, tentative and inconclusive. And that's exactly what it is. All you have in this case, the only evidence you have is a brain scan that shows that the experts were to look at and said, I think this is traumatic brain injury. There's absolutely no clinical assessment of this particular defendant to try to link that to his behavior in this case. And because he doesn't have that, there is no reasonable jurist who's going to find that that was mitigating, because all they're saying is it could possibly, it might, in other cases it tends to do this. We have nothing connecting that. We have nothing connecting the two. And even if you did, if you look at the things that were cited by the experts and they talk about difficulty with reasoning and problem solving, that was one of the potential effects of the brain damage that he was showing. Well, we have testimony in the record that he was of superior intelligence. The prosecutor argued during closing arguments that, hey, he's probably smarter than the rest of us. The sexual offender counselor who testified said he had superior abstract reasoning. So, again, just reiterating the point that we've got a list of potentials, but we don't have anything saying that this is actually true of Anthony Shore in this case. And then you also have nothing that connects, even if some of this were true, even if he was impulsive. You don't have anything that shows that the crimes that he committed were impulsive. You have the opposite. And you're not going to convince a jury that his stalking of these victims, he comes prepared with the ligature and with the dowel, and he knows when their birthdays are, and then he continues with the one sexual abuse victim to contact her, the one he didn't kill, that he was actually, ironically, proud of himself for being able to control his behavior and not kill her. He continues to do this afterwards. So you're not going to be able to connect these and show impulsivity. And so we're not disputing that perhaps he doesn't have brain damage. What we're saying is that there's absolutely no evidence connecting whatever possible damage he suffered to the crimes in this case, enough to convince a jury to find that this serial killer should not be sentenced to death. And, Your Honor, I know this is rather brief, and I'm happy to answer any questions, but we just so firmly believe that there's no way that reasonable jurists are going to debate this case, that unless you have additional questions, we're going to give our time back to the Court. All right, thank you. We have your argument. All right. Mr. Nonoli, you have some rebuttal time. Good job, Rod. I'd like to start my rebuttal by addressing the question you left me with after the opening, and that is where in our briefing to this Court we have cited our explanation for how we get beyond the burden, the procedural burden by Penn-Holster. Your Honor, regarding that question, we addressed Penn-Holster in our opening brief to this Court on pages 24 and 25 of our opening brief. Now, based upon addressing it on those pages, we later elaborate upon that in our reply by adding the further case law of Martinez-Trevino. But it is initially discussed, and it is the same argument on pages 24 and 25 of our opening brief. And we believe, again, that on nonexhaustive claims, we do not believe it applies to Penn-Holster. And where it is found to apply, we believe that the Martinez-Trevino exception allows us to make those claims anew in federal court, or federal habeas court. Your Honor, I'd like to address a couple of the claims made by the State and their argument. The first one goes towards the waiver. When trial counsel made their statements to the jury in opening argument prior to discussion in front of the judge, outside the presence of the jury, about whether or not Mr. Schor understood what he was doing and if it was true, that statement rung the bell. And as we all know, once the bell is rung, it cannot be unrung. Now, 30 minutes to 45 minutes later, or several days later after the State's argument, coming back and then trying to tell the jury, well, a proper waiver, tell this court that a proper waiver was done, is simply inexcusable. If a waiver wants to be done to apply to be proper, it should have been done before trial counsel got in front of the jury and made those arguments. Again, those arguments were made days before an actual waiver was put on the record. And beside that, I only refer to a single line. I do not want to waste the court's time by actually reading it, but it is very brief. And if you read it, I'm sure you'll come to the same conclusion that we have, that it is not a valid waiver and that it is unreasonable because Mr. Schor, even if you find it was a valid waiver, did not know all the information that was available to him. It was argued that perhaps Mr. Schor showed competence in front of the jury during the waiver colloquy, which was done during his pleading guilty to the indecency with a child charges, which he was on probation for when he was later charged with capital murder. We would argue that that is irrelevant. We are not arguing that whether Mr. Schor was competent or not. We are simply arguing that the traumatic brain injury that he suffered could have had an effect upon his moral culpability. We're not saying that is the reason why he committed his crimes. We are simply saying that it could be a compounding factor or a reason that elevated himself from simply perhaps stalking someone to going to the next horrible level, which we've heard evidence of, we've heard a state's attorney go into, of the rapes and murders he was later charged and convicted of in this capital murder trial. Your Honor, as to the evidence that Mr. Schor's intelligence, we're not arguing that Mr. Schor is unintelligent. We are arguing that Mr. Schor's brain injury simply mitigates his moral culpability. Honor, also going to the sister's testimony, I do understand that this was a small portion of the state's argument during his punishment. However, the reason why we raise it is we believe, as I'm sure it struck out to you when you read the facts of this case, it is perhaps some more of the salacious evidence against Mr. Schor by showing that to the jury, as our public has seen in horror movies and serial killer books, that he was murdering small animals and torturing children at a young age. The effect upon that of the jury is dramatic.  and was not by an active, effective counsel. Your Honor, the largest burden in this case, and we freely admit this, is the burden we have to overcome with prejudice. Mr. Schor has other murders, other sexual assaults. He is a pedophile. This is a large burden. We do not believe it is an insurmountable burden. Again, we believe that with a single juror, someone who understands and believes that the effect of a traumatic brain injury, something, again, our society is more familiar with and comfortable with than they were two decades ago, the effect of that upon the behavior of Mr. Schor could be enough to convince somebody that his moral culpability was excusable. Thank you for my time. All right. Thank you, sir. You're court-appointed. We appreciate the work you put in on the briefs and oral argument today. All right. We are at recess. Thank you.